1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| UNION PACIFIC RAILROAD COMPANY,<br><br>                    Plaintiff,<br><br>          v.<br><br>ROBERT E. HILL, et al.,<br><br>                    Defendants. | Case No.  21-cv-03216-BLF<br><br>**ORDER DENYING HILL MOTION TO DISMISS; GRANTING IN PART AND DENYING IN PART MOBILE MINI MOTION TO STRIKE**<br><br>[Re:  ECF Nos. 20, 21] |

Plaintiff Union Pacific Railroad Company has filed this lawsuit seeking recovery of costs, declaratory and injunctive relief, and damages related to environmental remediation required due to the improper use of chemical agents on a property previously leased to entities affiliated with Defendants Robert E. Hill, Robert W. "Rocky" Hill, Privette Inc., and Mobile Mini Inc.  Two groups of defendants have filed motions in response to the Complaint.  First, both Hills and Privette Inc. have moved to dismiss the Resource Conservation and Recovery Act claim and all requests for punitive damages.  ECF No. 20 ("Hill MTD").  Second, Mobile Mini has moved to strike all claims against it for failure to adequately allege successor or agency liability.  ECF No. 21 ("MM MTS").  Union Pacific opposes both motions.  *See* ECF Nos. 28 ("MM Opp."), 29 ("Hill Opp.").  The Court previously vacated the hearing on the motions.  *See* ECF No. 57.  For the reasons stated below, the Hills' motion is DENIED and Mobile Mini's motion is GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND

As alleged in the Complaint, Union Pacific owns the real property located at 725 Chestnut Street in San Jose, California, which abuts its railroad tracks to the southwest.  ECF No. 1 ("Compl.") ¶ 12.  Union Pacific has owned the property since the late 1800s and since the 1960s

1  has leased it to various entities, including the defendants here.  *Id.* ¶¶ 13–14.

2      From 1960 through 1963, a business called "A.R. Bodenhamer" used the property to store

3  a contractor's equipment pursuant to leases executed in 1960 and 1962 with Union Pacific's

4  predecessor Southern Pacific Company.  *Id.* ¶¶ 15, 24–26.  Defendant Robert E. Hill allegedly

5  operated A.R. Bodenhamer.  *Id.*  Around 1962, Hill began doing business on the property as "ZZZ

6  Sanitation Co.," which manufactured and refurbished portable chemical toilets and job shacks to

7  rent to construction site operators and conducted other business involving the use of chemicals.

8  *Id.* ¶ 16.

9      In 1964, Privette Inc. was incorporated, and Hill and his son Robert W. "Rocky" Hill

10  served as officers and directors of the company.  Compl. ¶ 17.  Privette too did business as ZZZ

11  Sanitation Co., which entered into a lease with Southern Pacific Company in July 1964.  *Id.* ¶ 22.

12  That lease was superseded by a lease executed in 1980.  *Id.* ¶ 32.  Privette continued similar

13  operations over the lease period and used the property until 1986, when it sold its assets.  *Id.* ¶ 17.

14  Privette dissolved on July 8, 1987 and is named to access its remaining insurance assets.  *Id.*

15      In October 1983, Tote-A-Shed Inc. was incorporated, and both Hills served as officers and

16  directors.  *Id.* ¶ 18.  Tote-A-Shed also did business as ZZZ Sanitation Co.  *Id.* ¶ 22.  Tote-A-Shed

17  repurposed and leased portable storage and old marine containers.  *Id.* ¶ 18.  Tote-A-Shed ceased

18  operating on the property in around November 1992.  *Id.*  In February 2004, it allegedly merged in

19  Mobile Mini, which is alleged to be Tote-A-Shed's successor-in-interest.  *Id.*

20      Defendants' use of the property allegedly involved the use of chemicals in painting,

21  stripping, degreasing, and priming toilets, electrical panels, power poles, portable sheds, and

22  shipping containers.  Compl. ¶ 39.  Defendants also improperly used and maintained underground

23  storage tanks ("USTs") located on the property.  *Id.*  For example, in June 1992, after a referral

24  from the Santa Clara County Health Department Toxic Control Unit, the San Jose Fire Department

25  found an unearthed UST on the property and deemed it an "explosion hazard."  *Id.* ¶¶ 40–41.  The

26  fire department wrote to Tote-A-Shed informing it of its responsibility to obtain a permit to

27  remove the UST, use a licensed waste hauler, and obtain and submit soil samples.  *Id.* ¶ 42.  The

28  tank was removed, although it is unknown when or by whom, and Tote-A-Shed abandoned the

United States District Court
Northern District of California

2

1    property without collecting soil samples.  *Id.* ¶¶ 43–44.

2          As a result of defendants' actions, the property has become contaminated with numerous

3    pollutants, including the following:

4          • trichloroethylene ("TCE"), tetrachloroethylene ("PCE"), cis-1,2-dichloroethene

5              (cis-1,2-DCE), 1,1-dichloroethane ("1,1-DCA"), 1,2-dichlorobenzene, methylene

6              chloride, 1,1,1-trichloroethane ("1,1,1-TCA"), Freon 113, benzene, toluene,

7              ethylbenzene, xylenes, and acetone in soil;

8          • TCE, PCE, vinyl chloride, cis-1,2-DCE, 1,1-DCA, trans-1,2-dichloroethene

9              ("trans-1,2-DCE"), 1,1,1-TCA, carbon tetrachloride, 1,2-dibromo-3-

10             chloropropane, 1,1-dichloroethene, cis-1,2-DCE, 1,2-dichlorobenzene, methyl ethyl

11             ketone ("MEK"), acetone, benzene, ethylbenzene, xylenes, and 1,4-dioxane in

12             groundwater; and

13         • TCE; 1,1-DCA; 1,2-DCA; benzene; chloroform, and vinyl chloride in soil vapor.

14   Compl. ¶ 34.  The contaminants continue to spread in soil, groundwater, and air.  *Id.* ¶ 35.

15         Union Pacific filed this suit on April 30, 2021, asserting claims for (1) cost recovery under

16   the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42

17   U.S.C. § 9607; (2) declaratory relief under CERCLA and the Declaratory Judgment Act, 28

18   U.S.C. § 2201; (3) injunctive relief and costs of litigation under the Resource Conservation and

19   Recovery Act ("RCRA"), 42 U.S.C. §§ 6972(a)(1)(A), 6792(a)(1)(B); (4) contribution and

20   indemnity under the California Carpenter-Presley-Tanner Hazardous Substance Account Act

21   ("HSAA"); (5) private continuing nuisance; (6) public continuing nuisance; and (7) continuing

22   trespass.  Compl. ¶¶ 46–112.  Union Pacific seeks cost recovery, declaratory and injunctive relief,

23   contribution or indemnity, damages, and punitive damages.  *Id.* at Prayer for Relief.

24   **II.    LEGAL STANDARD**

25         "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

26   claim upon which relief can be granted 'tests the legal sufficiency of a claim.'"  *Conservation*

27   *Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d

28   729, 732 (9th Cir. 2001)).  When determining whether a claim has been stated, the Court accepts

United States District Court
Northern District of California

as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

## III.   HILL MOTION TO DISMISS

Both the Hills and Privette Inc. have filed a motion to dismiss. Hill MTD.[1] They seek to dismiss the RCRA claim—in both of its forms under §§ 6972(a)(1)(A) ("Subsection A") and 6972(a)(1)(B) ("Subsection B")—and all requests for punitive damages. *Id.* Although the Complaint states only a single claim for violation of the RCRA, that claim specifies the two sections of the RCRA as separate grounds for relief. *See* Compl. ¶¶ 61 (Subsection B), 62 (Subsection A). The Court will treat the two subsections separately, as do the parties.

### A.   RCRA Subsection A

The RCRA allows an injured party to bring a citizen suit "against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to the [RCRA]." 42 U.S.C. § 6972(a)(1)(A). Among the RCRA's requirements are those regarding USTs, as specified by the EPA's

---

[1] Mobile Mini has joined the Hill motion to dismiss. MM MTS at 4. The Court's analysis applies equally to these claims as asserted against Mobile Mini.

United States District Court
Northern District of California

4

corresponding implementing regulations.  Those regulations are applicable to "all owners and operators of a UST system."  40 C.F.R. § 280.10(a).  The regulations provide a two-part definition of an "owner."  First, the regulations cover "any person who owns a[] UST system in use on November 8, 1984 or brought into use after that date."  *Id.* § 280.12.  Second, for "any UST system in use before November 8, 1984," the regulations cover "any person who owned such UST immediately before the discontinuation of its use."  *Id.*  As such, it is clear that "Congress intended to impose current RCRA obligations on past [UST] owners."  *Andritz Sprout-Bauer, Inc. v. Beazer E., Inc.*, 174 F.R.D. 609, 618–19 (M.D. Pa. 1997).

The Hills argue that the RCA Subsection A claim should be dismissed because they are not current owners or operators on the property and are thus not "in violation of" the UST requirements.  Hill MTD at 9–12.  They say that "to be in violation of" RCRA requirements necessitates a "state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future."  *Id.* at 10 (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987)).  No defendant has occupied the property for over 30 years, they say, and so they cannot be "in violation of" the UST requirements.  *Id.* at 10–12.

Union Pacific responds that the Hills are "owners" covered by the RCRA because they were using a UST system after November 8, 1984, regardless of their abandonment of the property and unlawful removal of one or more USTs.  Hill Opp. at 6–8.  Union Pacific says that, as "owners," the Hills have continuing remediation obligations for the removed UST and so are still "in violation of" the UST regulations under the RCRA.  *Id.*

The Court finds that the parties have muddled two separate issues:  first, whether the Hills are "owners" of the UST under the RCRA; and second, whether the Hills are "in violation of" the UST regulations.  On the former—and contrary to the Hills' arguments that they are not "owners" because they abandoned the property—the allegations supporting a finding that the Hills are statutory "owners" of a UST under the RCRA are sufficient.  The Complaint alleges and the Hills do not dispute that they used a UST system that was "in use on November 8, 1984 or brought into use after that date."  40 C.F.R. § 280; Compl. ¶¶ 18, 39.  Thus, the actual issue is whether the

1    allegations in the Complaint demonstrate that Hills are "in violation of" the RCRA's UST
2    obligations as statutory owners.

3         The Court concludes that the Complaint adequately alleges facts supporting that the Hills
4    are "in violation of" the UST regulations under the RCRA for failure to fulfill their remediation
5    obligations, despite their abandonment of the property and the removal of the UST.  As an owner
6    of the UST, the Hills must, "in response to a confirmed release from the UST system," comply
7    with the requirements of [subpart F]."  40 C.F.R. § 280.60.  Subpart F imposes several different
8    requirements, including initial response, initial abatement measures, initial site characterization,
9    free product removal, soil and ground water cleanup, and a corrective action plan.  *See id.*
10   §§ 280.71–280.66.  And the Complaint alleges the Hills' failure to comply with these
11   requirements.  Compl. ¶ 68.

12        The Hills' abandonment of the property and removal of the UST do not change this
13   conclusion.  Union Pacific's RCRA Subsection A claim is not based on the actual leak from the
14   UST—regardless of the exact time at which it occurred.  The claim is based on the Hills' failure to
15   comply with their *continuing* remediation obligations under the UST regulations in the RCRA due
16   to the alleged leak.  Because the Hills have allegedly failed to comply with their continuing
17   obligations, they are presently "in violation of" those obligations.

18        Two out-of-circuit decisions cited by Union Pacific support this holding.  *Raymond K.*
19   *Hoxsie Real Est. Tr. v. Exxon Educ. Found.*, 81 F. Supp. 2d 359 (D.R.I. 2000), is particularly
20   instructive.  In *Hoxsie*, the dispute centered on a property located at 92 Granite Street in Westerly,
21   Rhode Island.  From at least 1950 through 1984, the property was operated as a gas station by
22   Exxon and independent franchise dealers.  Between September and October 1984, Exxon
23   terminated its use of the property and removed several underground storage tanks that had been
24   used to store petroleum.  In 1985, the property was sold to two individuals from whom the
25   plaintiff acquired the property a year later.  In 1994, petroleum contamination was discovered in
26   the soil and groundwater, which the plaintiff alleged had been caused by the petroleum USTs used
27   by Exxon.  Exxon argued that it could not be held liable because it removed the USTs in 1984 and
28   no longer used the property.  *Id.* at 361–62.

United States District Court
Northern District of California

6

The *Hoxsie* court decisively rejected that argument. First, the court held that Exxon was a statutory "owner" of the UST system because it controlled a UST system immediately prior to its discontinuation before 1984. *Hoxsie*, 81 F. Supp. 2d at 364. The court relied on the decision in *Dydio v. Hesston Corp.*, 887 F. Supp. 1037 (N.D. Ill. 1995), which had similarly concluded that a prior owner of a property could be liable for failure to remediate later-discovered petroleum contamination caused by a leaking UST, despite vacating the property and not using the UST— which still remained in the ground—after that date. The *Hoxsie* court rejected Exxon's attempt to distinguish *Dydio* because of Exxon's removal of the USTs at issue or the timing of the leak. First, the court noted that Exxon's status as an "owner" was not affected by removal of the UST system and instead depended on when the UST was "in use." *Hoxsie*, 81 F. Supp. 2d at 364. Second, the *Hoxsie* court, again relying on *Dydio*, found that liability under the UST regulations did not depend on the timing of the leak. The *Hoxsie* court again emphasized that plaintiff's claim was not that the defendant violated the RCRA by "causing a release; rather it [was] that [defendant] is presently violating [the] RCRA by failing to take corrective actions as is required by the regulations." *Id.* at 365.

The cases cited by the Hills do not compel a different conclusion. Several of the cases do not involve underground storage tanks, and so are not instructive as to continuing remediation obligations under the relevant regulations. For example, the *Dydio* court distinguished *Gwaltney* 484 U.S. at 58, which involved an interpretation of "in violation of," because "[t]here [was] no indication whatsoever . . . that the defendant was alleged to be in violation of ongoing corrective action requirements." *Dydio*, 887 F. Supp. at 1043; *see also Andritz Sprout-Bauer*, 174 F.R.D. at 619 (same). The Hills' reliance on *Bd. of Cty. Comm'rs of Cty. of La Plata, Colorado v. Brown Grp. Retail, Inc.*, 598 F. Supp. 2d 1185 (D. Colo. 2009), is similarly unavailing. The court granted a motion to dismiss there because plaintiff failed to allege that defendant was "a current owner or operator of a polluting property" that had groundwater contaminated by solvents flushed down a drain. *Id.* at 1192. But the case did not involve USTs and so did not implicate the statutory definition of a UST "owner," which the Court has already found the Hills satisfy.

Finally, the Court disagrees with the conclusion reached in *N. Cal. River Watch v. Exxon*

*Mobil Corp.*, 2010 WL 3184324 (N.D. Cal. Aug. 11, 2010).  There, Exxon operated gas stations on the subject property until it sold the properties in 2000.  The plaintiff sought to impose liability on Exxon by pleading an RCRA violation starting in June 2004 based on Exxon's failure to continue an in-progress cleanup.  The court concluded that Exxon was not an "owner" or "operator" in present violation of the RCRA because it sold the properties prior to the violation date.  But the court did not consider—and the plaintiff did not raise—the statutory definition of "owner" in the UST regulations.  In fact, the court noted that plaintiff had "fail[ed] to submit legal authority persuasively indicating that unremediated hazardous wastes can constitute an ongoing violation under the RCRA as to prior owners specifically."  *Id.* at *5.  The court also did not analyze the *Hoxsie* or *Dydio* decisions, and instead relied on cases that did not involve USTs and which this Court has already discussed and distinguished.  *See id.* at *3–6 (citing *Gwaltney*, 484 U.S. 49, and *La Plata*, 595 F. Supp. 2d at 1185).  Accordingly, this Court declines to follow *N. Cal. River Watch*.

The timing of the alleged leak, the removal of the USTs, and the Hills' abandonment of the property are thus not relevant to their potential liability for failing to comply with their continuing remediation obligations.  As statutory "owners" of the USTs, they can be "in violation of" Subsection A of the RCRA for failing to satisfy their continuing remediation obligations.  Union Pacific has thus sufficiently stated a claim under Subsection A of the RCRA.

### B.   RCRA Subsection B

A citizen suit separately lies under the RCRA "against any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."  42 U.S.C. § 6972(a)(1)(B).

The Hills argue that Union Pacific has not sufficiently pled "imminent and substantial endangerment to health or the environment."  Hill MTD at 7–9.  The Hills say that the allegations in the Complaint are "only a formulaic and conclusory recitation of the elements" of a subsection B claim and that Union Pacific's 13-year delay in filing this lawsuit weighs against finding "imminent and substantial endangerment."  *Id.*  Union Pacific responds by defending the

1    sufficiency of its allegations and argues that it should not be penalized for conducting a lengthy

2    remediation investigation before bringing this lawsuit.  Hill Opp. at 9–16.

3              "[D]istrict courts in the Ninth Circuit have interpreted 'imminent and substantial

4    endangerment' liberally."  *Sullins v. Exxon/Mobil Corp.*, 2011 WL 8077086, at \*4 (N.D. Cal. Jan.

5    26, 2011).  "Because the word 'may' precedes the standard of liability, Congress included

6    expansive language intended to confer upon the courts the authority to grant affirmative equitable

7    relief to the extent necessary to eliminate any risk posed by toxic wastes."  *Id.* (quoting *California*

8    *Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.*, 298 F. Supp. 2d 930, 980

9    (E.D. Cal. 2003)).  "Imminence refers 'to the nature of the threat rather than the identification of

10   the time when the endangerment initially arose.'"  *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th

11   Cir. 1994).  "Endangerment is substantial if there is some reasonable cause for concern that

12   someone or something may be exposed to a risk of harm by a release or a threatened release of a

13   hazardous substance if remedial action is not taken."  *Interstate Non-Ferrous Corp.*, 298 F. Supp.

14   at 980.

15             The Court agrees with Union Pacific that it has sufficiently pled "imminent and substantial

16   endangerment."  The Complaint contains a list of several environmental contaminants present in

17   soil, groundwater, and soil vapor.  Compl. ¶ 34.  RCRA notice letters sent to defendants—which

18   are attached to the Complaint—indicate that the concentrations of these contaminants "far

19   exceed[] federal and state standards.  *See* Compl., Exs. B, C.  Indeed, one of the compounds is

20   present in concentrations 68,000 times higher than the federal maximum limit.  *See* Compl., Ex. B

21   at 30.  Viewing these allegations in the light most favorable to Union Pacific, the Court is

22   persuaded that the FAC contains sufficient allegations that the contaminants "may present an

23   imminent and substantial endangerment to health or the environment."  *See Quantum Labs, Inc. v.*

24   *Maxim Integrated Prods. Inc.*, 2019 WL 6117481, at \*5–6 (N.D. Cal. Nov. 18, 2019) ("imminent

25   and substantial endangerment" adequately pled where complaint alleged that cobalt contaminants

26   were carcinogens and were present "well-above the permitted limits").

27             Neither the passage of time nor any voluntary cleanup Union Pacific has performed

28   necessarily preclude a finding of imminent and substantial endangerment.  "While the fact that

*United States District Court*
*Northern District of California*

9

1    remedial efforts have been underway for years undermines the immediately of the danger, it is not

2    alone determinative." *Occidental Rsch. Corp. v. Tamkin as Tr. of Tamkin Fam. Tr.*, 2018 WL

3    1941933, at *3 (C.D. Cal. Apr. 2, 2018); *see also Spillane v. Commonwealth Edison Co.*, 291 F.

4    Supp. 2d 728, 736 (N.D. Ill. 2003) ("[V]oluntary, self-funded participation in a state program does

5    not preclude a simultaneous federal suit.  The fact that the voluntary remediation may be ongoing

6    does not moot the issue of endangerment . . . .").  Despite the passage of time and Union Pacific's

7    alleged participation in partial remediation, "imminent and substantial endangerment" is

8    adequately pled at this stage.

9         Much of the Hills' argument to the contrary depends on documents for which the Hills

10   have requested judicial notice, which Union Pacific opposes.  *See* ECF No. 20-2 (RJN); Hill Opp.

11   at 19–21 (objecting to request for judicial notice).  The Court DENIES the request for judicial

12   notice because the documents attached are subject to reasonable dispute.  The Court will not

13   dismiss the RCRA claim based on documents that Union Pacific claims are incomplete and

14   without the benefit of all relevant evidence and information before it.  *See Occidental Research*

15   *Corp.*, 2018 WL 1941933, at *3 (declining to dismiss RCRA "imminent and substantial

16   endangerment claim" on basis of delay "without all pertinent evidence and information before it").

17       **C.    Punitive Damages**

18       Finally, the Hills ask the Court to dismiss all claims for punitive damages asserted in the

19   Complaint because the allegations are "wholly conclusory and unsupported by any facts to

20   establish entitlement to punitive damages."  Hill MTD at 12–15.  Union Pacific responds that

21   additional allegations are not required at this early stage of the case.  Hill Opp. at 16–17.

22       The Court agrees with Union Pacific.  "[A] plaintiff may include a short and plain prayer

23   for punitive damages that relies entirely on unsupported and conclusory averments of malice or

24   fraudulent intent."  *Rees v. PNC Bank, N.A.*, 308 F.R.D. 266, 273 (N.D. Cal. 2015).  Union

25   Pacific's allegations are more than sufficient to meet this standard.  Union Pacific points to its

26   allegations that the Hills unlawfully removed a UST from the subject property, which became an

27   "explosion hazard," and then vacated the property without complying with their remediation

28   obligations.  Compl. ¶¶ 40–45.  Union Pacific also alleges that the Hills' failure to properly use

United States District Court
Northern District of California

10

and maintain the UST resulted in the leak and accumulation of several dangerous environmental contaminants, which continue to spread in soil, groundwater, and air. *Id.* ¶¶ 34–37. These allegations are sufficient at the pleading stage to request punitive damages.

For those reasons, the Hill MTD is DENIED.

## IV.   MOBILE MINI MOTION TO STRIKE

Mobile Mini has moved to strike all claims against it that are based on the actions of the Hills and Privette, arguing that the Complaint fails to adequately allege either successor or agency liability. MM MTS. Union Pacific opposes, defending the sufficiency of its allegations on both theories of liability. *See* MM Opp. The Court evaluates each theory in turn.[2]

### A.   Successor Liability

Mobile Mini first argues that Union Pacific fails to allege successor liability because it has not alleged one of the four conditions that would impose such liability on Mobile Mini. MM MTS at 6–7. Union Pacific says that its allegations sufficiently plead successor liability under multiple different theories. MM Opp. at 10–14.

"[T]he 'federal common law' rules for successor liability under CERCLA in this circuit mirror the traditional successor liability rules of most states, including California." *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 361 (9th Cir. 1997). Thus, the "general rule of successor nonliability provides that where a corporation purchases or otherwise acquires by transfer, the assets of another corporation, the acquiring corporation does not assume the selling corporation's debts and liabilities." *Winner Chevrolet, Inc. v. Universal Underwriters Ins. Co.*, 2008 WL 2693741, at *3 (E.D. Cal. Jul. 1, 2008 (quoting *Fisher v. Allis-Chalmers Corp. Prod. Liab. Tr.*, 95 Cal. App. 4th 1182, 1188 (2002)). "[A]sset purchasers are not liable as

---

[2] Mobile Mini and Union Pacific dispute whether the motion is properly brought as a motion to strike or a motion to dismiss. The form of the motion is immaterial in this instance—both parties recognize that the motion to strike can be treated as a motion to dismiss. *Harrell v. City of Gilroy*, 2018 WL 2383212, at *7 (N.D. Cal. 2018). The Court will do so here, although it does not affect the Court's analysis.

United States District Court
Northern District of California

successor corporations unless:  (1) [t]he purchasing corporation expressly or impliedly agrees to assume the liability; (2) [t]he transaction amounts to a 'de-facto' consolidation or merger; (3) [t]he purchasing corporation is merely a continuation of the selling corporation; or (4) [t]he transaction was fraudulently entered into in order to escape liability." *Atchison, Topeka & Santa Fe Ry. Co.*, 159 F.3d at 361.  Union Pacific argues that it alleges facts to support the first three types of successor liability.

To sufficiently plead assumption of liability, Union Pacific must plead "either the terms of that assumption of liability (if express) or the factual circumstances giving rise to an assumption of liability (if implied)."  *Winner*, 2008 WL 2693741, at *4.  To survive a motion to dismiss, Union Pacific must plead more than merely the legal conclusion that a successor corporation assumed the liabilities of the predecessor.  *See No Cost Conf., Inc. v. Windstream Commc'ns, Inc.*, 940 F. Supp. 2d 1285, 1299 (S.D. Cal. 2013); *see also Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021) (affirming dismissal of successor liability theory where plaintiff "made only a conclusory allegation" that a company and its subsidiaries "comprise successor corporate business entities" of another company).

Union Pacific has pleaded sufficient "factual circumstances giving rise to an assumption of liability" under an implied theory.  *Winner*, 2008 WL 2693741, at *4.  Only two entities ever leased the property from Union Pacific—A.R. Bodenhamer and ZZZ Sanitation Co.—neither of which was incorporated.  Compl. ¶¶ 24–25, 28–32.  Union Pacific has alleged that Tote-A-Shed and the other defendants were all "dba" as ZZZ Sanitation Co.  *Id.* ¶ 33.  Neither Tote-A-Shed nor Privette was ever formally added to the lease agreements.  *Id.* ¶¶ 24–33.  As Privette and Tote-A-Shed continued the business operations of the predecessor entities, Union Pacific has alleged that the Hill defendants "held [the corporations] out as one and the same, representatives, continuations, or agents of each other."  *Id.* ¶ 21.  At the conclusion of defendants' use of the property, only Tote-A-Shed remained.  *Id.* ¶ 22.  These factual allegations, taken as true at the pleading stage, are sufficient to make out an implied assumption of liability.

Because the Court finds sufficient allegations to plead the first type of successor liability, it need not reach the de-facto merger or mere continuation theories also defended by Union Pacific.

United States District Court
Northern District of California

### B.   Agency Liability

Mobile Mini also argues that Union Pacific fails to allege agency liability.  MM MTS at 7–9.  Union Pacific says that its allegations sufficiently plead agency liability, and that it need not specify the exact theory of agency.  MM Opp. at 14–20.

Under bedrock principles of law, "[a] principal is liable for the torts of its agents committed within the scope of their authority."  *Qiuzi Hu v. Plehn-Dujowich*, 2018 WL 8221268, at *6 (N.D. Cal. Dec. 11, 2018) (citing *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476–77 (9th Cir. 2015)).  To determine whether agency liability is imposed, "'the extent of control exercised by the [principal]' is the 'essential ingredient.'"  *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 450 (9th Cir. 2018) (quoting *United States v. Bonds*, 608 F.3d 495, 505 (9th Cir. 2010)).

Here, Union Pacific has failed to sufficiently plead a principal-agent relationship that would make Mobile Mini liable for the acts of the Hills and Privette.  First, Union Pacific fails to clearly identify the principal-agent relationship in its Complaint, instead offering only a conclusory allegation that lumps all defendants together.  *See* Compl. ¶ 21 ("Some or all of the Defendants may have been related to one another in a successor liability or agency capacity.").  If the Complaint can be characterized as offering any agency theory, it is one that makes the Hills principals of the companies, not agents of them.  For example, in its CERCLA claim, Union Pacific identifies both Hills as "principals of Tote-A-Shed and Privette."  *Id.* ¶ 51.  Additionally, Union Pacific's letter to the Hills identifies them as "principals and operators" of Privette and Tote-A-Shed.  Compl., Ex. C at 35.  Although some other allegations in the Complaint could arguably support a theory that Privette and/or Tote-A-Shed were principals, they conflict with these explicit allegations of the reverse agency relationship.

Union Pacific has thus failed to adequately allege a principal-agent relationship that would make Mobile Mini liable as principal for the acts of Tote-A-Shed as an agent.  Mobile Mini argues that Union Pacific should be denied leave to amend because any allegations reversing the alleged principal-agent relationship would be inconsistent with the allegations in the current Complaint.  ECF No. 31 at 7–8.  The Court agrees.  *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296–97 (9th Cir. 1990) ("Although leave to amend should be liberally granted, the amended complaint may

13

only allege other facts consistent with the challenged pleading.").  Having already alleged that the Hills were principals of Privette and Tote-A-Shed, Union Pacific cannot now reverse course and allege that they are in fact agents.  Leave to amend the agency allegations is thus DENIED.

## V.    ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

- the Hill MTD is DENIED; and
- the Mobile Mini MTS is GRANTED IN PART as to Union Pacific's theory of agency liability, WITHOUT LEAVE TO AMEND; and
- the Mobile Mini MTS is DENIED in all other respects.

**No later than January 14, 2022**, all Defendants shall file answers to the Complaint.

Dated:  December 16, 2021

BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

14