1
2
3
4
5
6

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

UNION PACIFIC RAILROAD
COMPANY,

        Plaintiff,

    v.

ROBERT E. HILL, et al.,

        Defendants.

Case No.  21-cv-03216-BLF

**ORDER DENYING MOTION TO
DISQUALIFY COUNSEL**

[Re:  ECF No. 86]

Before the Court is Plaintiff Union Pacific Railroad Company's ("Union Pacific") motion to disqualify Allen Matkins Leck Gamble Mallory & Natsis LLP ("Allen Matkins") and Silicon Valley Law Group ("SVLG"), counsel for Defendant Mobile Mini, Inc. and Defendants Robert E. Hill, Robert W. Hill, and Privette Inc., respectively (collectively "Defendants").  ECF No. 86 ("Mot.").  Defendants oppose the motion.  ECF No. 90 ("Opp.").  Union Pacific filed a reply.  ECF No. 94 ("Reply").  The Court held a hearing on August 27, 2023.  ECF No. 95.  At the hearing, the Court permitted the parties to submit supplemental briefing on the question of whether vicarious disqualification is automatic.  ECF Nos. 99, 100.  After the hearing, the Court requested further supplemental briefing on James Meeder's relationship with Allen Matkins.  ECF Nos. 105, 106, 107.

For the reasons below, the Court DENIES Union Pacific's Motion to Disqualify Counsel.

### I.  BACKGROUND

#### A.  The Current Representation

Union Pacific owns the real property located at 725 Chestnut Street in San Jose, California, which abuts its railroad tracks to the southwest.  ECF No. 1 ("Compl.") ¶ 12.  Union Pacific is the successor-in-interest to Southern Pacific Company and Southern Pacific Transportation Company

United States District Court
Northern District of California

1    (collectively "Southern Pacific").  *See* ECF No. 86-18 ("Bylsma Decl.") ¶ 4 (describing the

2    relationship between Union Pacific and Southern Pacific).  Union Pacific has owned the property

3    since the late 1800s and since the 1960s has leased it to various entities, including Defendants.

4    Compl. ¶¶ 13–14.

5         On April 30, 2021, Union Pacific brought the present action, alleging that Defendants or

6    entities affiliated with Defendants had contaminated the property through the use of chemicals in

7    painting, stripping, degreasing, and priming toilets, electrical panels, power poles, portable sheds,

8    and shipping containers. *Id.* ¶ 39.  Union Pacific further alleges that Defendants improperly used

9    and maintained underground storage tanks ("USTs") located on the property. *Id.*  Union Pacific

10   alleges that, as a result of these activities, the property is now contaminated with numerous

11   pollutants, including the following:

12   • trichloroethylene ("TCE"), tetrachloroethylene ("PCE"), cis-1,2-dichloroethene (cis-1,2-

13     DCE), 1,1-dichloroethane ("1,1-DCA"), 1,2-dichlorobenzene, methylene chloride, 1,1,1-

14     trichloroethane ("1,1,1-TCA"), Freon 113, benzene, toluene, ethylbenzene, xylenes, and

15     acetone in soil;

16   • TCE, PCE, vinyl chloride, cis-1,2-DCE, 1,1-DCA, trans-1,2-dichloroethene ("trans-1,2-

17     DCE"), 1,1,1-TCA, carbon tetrachloride, 1,2-dibromo-3- chloropropane, 1,1-

18     dichloroethene, cis-1,2-DCE, 1,2-dichlorobenzene, methyl ethyl ketone ("MEK"), acetone,

19     benzene, ethylbenzene, xylenes, and 1,4-dioxane in groundwater; and

20   • TCE; 1,1-DCA; 1,2-DCA; benzene; chloroform, and vinyl chloride in soil vapor.

21   *Id.* ¶ 34.  The contaminants continue to spread in soil, groundwater, and air. *Id.* ¶ 35.

22        On January 14, 2022, Defendants filed answers to Union Pacific's complaint, which

23   included counterclaims against Union Pacific.  *See* ECF Nos. 59, 60.  Defendants' counterclaims

24   allege that Union Pacific contaminated the property through its operations, activities, and

25   omissions on or adjacent to the property.  *See* ECF No. 59 at 27–28; ECF No. 60 at ¶ 122.

26   Defendants have pursued this theory in discovery.  For example, Mobile Mini sought additional

27   interrogatories looking for "basic information about Union Pacific's own use of, and history of

28   contamination involving, the chemicals here at issue (chlorinated solvents) to support its defense

2

and counterclaim that Union Pacific itself caused the contamination." ECF No. 86-13 at 4.  This included information about Union Pacific employees with knowledge of contaminating activities, Union Pacific's programs and policies involving chlorinated solvents and underground tanks, and other legal actions involving allegations of contamination involving Union Pacific and chlorinated solvents.  *Id.*

On August 4, 2023, Defendants deposed Mark Ransom in his individual capacity— Ransom is the former Environmental Manager of Southern Pacific from 1984 to 1990 who continued to consult for Southern Pacific and Union Pacific as part of ERM-West, Inc.  ECF No. 86-19 ("Ransom Decl.") ¶¶ 1–3.  Consistent with Defendants' discovery and in support of their counterclaims, counsel from Allen Matkins and SVLG asked questions about environmental contamination related to other Union Pacific rail yards, including sites in San Luis Obispo and Bayshore.  ECF No. 86-11 ("Ransom Depo.") at 10:19–11:10; 22:19–24:9.  The subjects of the deposition also included Union Pacific's "Cleaners Committee," *id.* at 54:24–55:25, 60:23–61:3; Union Pacific's use of chlorinated solvents, *id.* at 55:1–58:21; underground vaults, *id.* at 77:25– 83:7; and Bunker C oil, *id.* at 79:15–18.

After the deposition, Ransom informed counsel for Union Pacific that he "was concerned that the deposition questions were predicated on confidential information that [he] had exchanged with [Allen Matkins lawyers David Cooke and James Meeder] in past cases."  Ransom Decl. ¶ 20. On August 18, 2023, after investigating the potential conflict, Union Pacific informed Defendants' counsel about the conflict.  ECF No. 86-1 ("Perch-Ahern Decl.") ¶¶ 6–7.  At an August 21, 2023 meet and confer between the parties, Allen Matkins confirmed that the firm had not obtained informed written consent from Union Pacific nor had it established an ethical wall prior to August 21, 2023.  *Id.* ¶ 10; *see also* Bylsma Decl. ¶¶ 6, 11 (Union Pacific confirmed that it has not provided written consent to Allen Matkins nor did it receive notice from Allen Matkins about any potential conflict).  After Allen Matkins and SVLG declined to withdraw from the case, Union Pacific brought the present motion.  Perch-Ahern Decl. ¶ 10.

**B.    The Prior Representations**

Union Pacific's allegations of a conflict of interest are based on two prior representations

by David Cooke and James Meeder in the mid-1990s. Cooke is currently a partner at Allen Matkins. ECF No. 90-2 ("Cooke Decl.") ¶ 2. Meeder, a former partner at Allen Matkins, retired from the firm on June 30, 2020. ECF No. 106-1 ("Marino Decl.") ¶ 5. On July 1, 2020, Meeder transitioned to a "limited contract attorney role" in which his work was limited to a single consolidated matter. *Id.* ¶ 6; *see also* ECF No. 90-4 ("Meeder Decl.") ¶ 4 (describing Meeder's role as "an hourly part-time contract attorney in an of counsel position"). Meeder moved from San Francisco, California to Bend, Oregon in March 2022. Meeder Decl. ¶ 5.

Before joining Allen Matkins, both attorneys worked at Brobeck, Phleger & Harrison until the early 1990s. *See* Cooke Decl. ¶ 2 (Cooke worked for Brobeck, Phleger & Harrison from 1980 to 1991); Meeder Decl. ¶ 3 (Meeder worked for Brobeck, Phleger & Harrison from 1975 to 1990). Meeder and Cooke then moved to Beveridge & Diamond, where they worked until 2000, when they joined Allen Matkins. *See* Cooke Decl. ¶ 2; Meeder Decl. ¶¶ 3–4. The relevant prior representations occurred while Cooke and Meeder were attorneys at Beveridge & Diamond.

### i.   *The Petra Group, Inc. v. Southern Pacific Transportation Co.* **("***Petra***")**

Cooke represented Southern Pacific in the *Petra* lawsuit in or around 1994 and 1995. In 1988, Southern Pacific sold property adjacent to the railroad and right-of-way in San Luis Obispo to the Petra Group, a real estate development company. ECF No. 86-4; Cooke Decl. ¶ 7; Ransom Decl. ¶ 10. During construction, the Petra Group discovered two USTs containing Bunker C oil that had caused contamination of the purchased property. Ransom Decl. ¶ 10; ECF No. 86-5. Southern Pacific installed the vaults in 1918, but it took the vaults out of service and buried them in 1929. ECF No. 91 at 16 (Southern Pacific's Opposition to the Petra Group's Motion for a New Trial). Southern Pacific paid for part of the cost of cleanup. *Id.* at 6 (The Petra Group's Settlement Conference Statement). In or around 1994, the Petra Group brought a lawsuit in California Superior Court against Southern Pacific, alleging "causes of action for suppression of facts, negligent misrepresentation, failure to notify buyers of known defects, nuisance and trespass." *Id.* The Petra Group alleged that Southern Pacific's failure to disclose the USTs resulted in the property's reduction in value and the company's financial ruin. *Id.* The case went to trial, and the jury returned a verdict in favor of Southern Pacific based on a finding that the

United States District Court
Northern District of California

1    Petra Group's claims were barred by the statute of limitations.  Cooke Decl. ¶ 9; Ransom Decl.

2    ¶ 12.

3           Cooke, then with Beveridge & Diamond, represented Southern Pacific at trial.  Cooke

4    Decl. ¶ 7; Ransom Decl. ¶ 11; ECF No. 86-3 (listing *Petra* as one of Cooke's representations on

5    the Allen Matkins website); ECF No. 86-4 (identifying Cooke as counsel for Southern Pacific at

6    trial); ECF No. 86-5 (same).  Ransom was a key witness at the *Petra* trial and notes that he

7    "worked closely with Mr. Cooke to prepare for my testimony during deposition and at trial."

8    Ransom Decl. ¶ 11.  Ransom continues that "I shared and exchanged confidential information

9    with Mr. Cooke regarding Southern Pacific's railroad operations, and we both worked with

10   Southern Pacific in-house counsel, who also exchanged confidential information with Mr. Cooke."

11   *Id.*  Cooke states that he cannot recall working with Ransom or any confidential information that

12   he might have acquired during the representation.  Cooke Decl. ¶ 12.  As of September 2023,

13   Allen Matkins had retained 104 full or partial boxes of documents related to *Petra*.  ECF No. 90-6

14   ("Macey Decl.") ¶ 4.  After Union Pacific filed its motion to disqualify, Allen Matkins hired Stuart

15   Block, another former Beveridge & Diamond lawyer that represented Southern Pacific in *Petra*.

16   Reply at 6; *see also* ECF No. 93-5 at 2 (listing Block as counsel of record on an opposition to a

17   motion to strike filed in *Petra*).

18           ii.    ***Kessler v. Southern Pacific Transportation Co.* ("*Kessler*")**

19          Meeder represented Southern Pacific and its co-defendant, Tunex, in the *Kessler* lawsuit in

20   1994 through 1996.  In 1977, the plaintiffs acquired a 15-acre property that was originally part of a

21   900-acre parcel owned by Southern Pacific on which Southern Pacific operated its Bayshore rail

22   yard in San Mateo County.  ECF No. 86-6 at 6 (*Kessler* complaint describing the property).  In

23   1990, the California State Department of Toxic Substances Control ("DTSC") issued an order

24   directing Southern Pacific and Tuntex to remediate the Bayshore rail yard.  Meeder Decl. ¶ 9.  In

25   1994, the plaintiffs filed their complaint in California Superior Court, alleging that Southern

26   Pacific's operations at the Bayshore rail yard from 1914 to 1983 and the dismantling of a UST

27   associated with those operations in 1988 created contamination in the soil and groundwater that

28   migrated to the plaintiffs' property.  *Id.* at 6–14.  TCE, PCE, and TCA were discovered in the area

United States District Court
Northern District of California

north of the rail yard.  *Id.* at 9.  Meeder noted that after discovery and study by environmental forensic consultants, "no chlorinated solvents were found on Kessler's property."  Meeder Decl. ¶ 12.  Metals and petroleum hydrocarbons, primarily Bunker C oil, were also discovered in groundwater and soil at the former rail yard.  ECF No. 86-6 at 10.  The complaint alleged claims of public nuisance, private nuisance, ultrahazardous activity, product defect, negligence, and trespass.  *Id.* at caption.

Meeder, then with Beveridge & Diamond, was lead counsel for Southern Pacific.  ECF No. 86-7 at 2 (answer showing Meeder as lead counsel); ECF No. 86-8 at 3 (case management conference questionnaire listing Meeder as trial counsel); ECF No. 86-9 at 3 (responses to interrogatories identifying Meeder as lead counsel for Southern Pacific).  Cooke appeared to have worked on *Kessler* briefly, billing one hour to the case.  ECF No. 86-16 at 3 (showing that Cooke billed an hour for "[c]onference with J. Meeder re trial strategy.").  Block also worked on *Kessler*—Block is listed as counsel for Southern Pacific on a motion in limine and billing records show that Block billed at least .75 hours to the case.  ECF No. 93-4 at 3 (billing records showing that Block billed .75 hours to the *Kessler* matter for "Legal research re jury instructions and procedures for motions in limine"); ECF No. 107-7 at 2 (listing Block as counsel of record on a motion in limine filed in *Kessler*).

Ransom served as a witness in *Kessler*, and Meeder helped to prepare Ransom for his deposition.  Ransom Decl. ¶¶ 13–14.  Ransom notes that, "in the course of such preparation and as part of the broader group discussions, we exchanged confidential information about Southern Pacific's investigation of environmental conditions and the relationship of railroad operations to those conditions, including allegations concerning railroad use and disposal of TCE in connection with maintenance and repair activities."  *Id.* ¶ 14.  Meeder has no recollection of what was said during client meetings, phone calls, or written communications regarding *Kessler*.  Meeder Decl. ¶ 14.

Finally, although Cooke and Meeder did not represent Union Pacific in *Universal Paragon Corp. v. Ingersoll-Rand Co. Ltd.*, No. 05-cv-3100-TEH (N.D. Cal. 2005), that case also involved a portion of the Bayshore rail yard.  *See* ECF No. 86-10 ¶ 5.  The defendants in *Universal Paragon*

served a subpoena on Meeder, in the care of Allen Matkins, seeking Meeder's documents from *Kessler*. *Id.* Meeder and Allen Matkins responded by producing the documents. *Id.* As of September 2023, Allen Matkins had retained twenty-four full or partial boxes of documents related to *Kessler*. Macey Decl. ¶ 4.

## II.    LEGAL STANDARD

All attorneys who practice before this Court are required to "[b]e familiar and comply with the standards of professional conduct required of members of the State Bar of California." Civ. L.R. 11-4(a)(1). In determining whether to disqualify counsel, this Court therefore applies California law. *In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000); *Hitachi, Ltd. v. Tatung Co.*, 419 F.Supp.2d 1158, 1160 (N.D. Cal. 2006). The party seeking disqualification bears the burden of establishing by a preponderance of the evidence the existence of a disqualifying prior representation. *Guifu Li v. A Perfect Day Franchise, Inc.*, No. 11–CV–01189–LHK, 2011 WL 4635176, at *3 (N.D. Cal. Oct. 5, 2011) (citing *H.F. Ahmanson & Co. v. Saloman Bros.*, 229 Cal.App.3d 1445, 1452 (1991)).

"The right to disqualify counsel is a discretionary exercise of the trial court's inherent powers." *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 264 F.Supp.2d 914, 918 (N.D. Cal. 2003). As such, the decision to disqualify counsel for a conflict of interest is a discretionary one that requires the careful balancing of a number of factors. *Trone v. Smith*, 621 F.2d 994, 999 (9th Cir. 1980); *see also Guifu Li*, 2011 WL 4635176, at *3. These factors include: "[A] client's right to chosen counsel, an attorney's interest in representing a client, the financial burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion." *People ex rel Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* ("*SpeeDee Oil*"), 20 Cal.4th 1135, 1145 (1999). Given the potential for abuse, motions for disqualification are subjected to strict judicial scrutiny, and a court examines such motions carefully "to ensure that literalism does not deny the parties substantial justice." *Id.* at 1144; *see also Optyl Eyewear Fashion Int'l Corp. v. Style Cos., Ltd.*, 760 F.2d 1045, 1049 (9th Cir. 1985). However, "[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar" and "[t]he important right to counsel of one's

1   choice must yield to ethical considerations that affect the fundamental principles of our judicial

2   process." *SpeeDee Oil*, 20 Cal.4th at 1145.

3   **III.   REQUEST FOR JUDICIAL NOTICE AND EVIDENTIARY ISSUES**

4       Before turning to the merits, the Court addresses the parties' requests for judicial notice

5   and evidentiary objections.  A court "may judicially notice a fact that is not subject to reasonable

6   dispute" because it "is generally known within the trial court's territorial jurisdiction" or "can be

7   accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

8   Fed. R. Evid. 201.

9       Union Pacific requests that the Court take judicial notice of two newspaper articles

10  describing the *Petra* case and the court documents from the *Petra* and *Kessler* cases.  Mot. at 15;

11  Reply at 7.  "[A] court may take judicial notice of publicly available newspaper and magazine

12  articles and web pages that indicate what was in the public realm at the time, not whether the

13  contents of those articles were in fact true."  *Reynolds v. Binance Holdings Ltd.*, 481 F.Supp.3d

14  997, 1002 (N.D. Cal. 2020) (quoting *Tarantino v. Gawker Media*, LLC, No. CV 14-603-JFW

15  FFMX, 2014 WL 2434647, at *1 (C.D. Cal. Apr. 22, 2014)).  Similarly, "[a] court may . . . take

16  judicial notice of the existence of another court's opinion or of the filing of pleadings in related

17  proceedings; the Court may not, however, accept as true the facts found or alleged in such

18  documents."  *GemCap Lending, LLC v. Quarles & Brady, LLP*, 269 F.Supp.3d 1007, 1019 (C.D.

19  Cal. 2017) (internal quotations omitted).

20      Defendants object to the Court's consideration of the two newspaper articles regarding the

21  *Petra* case, arguing that the articles are based on hearsay and lack foundation.  Opp. at 7. Union

22  Pacific replies that the newspaper articles fall under the ancient documents exception to hearsay.

23  Reply at 7.  The Court overrules Defendants' objections.  The newspaper articles are admissible as

24  ancient documents.  *See* Fed. R. Evid. 803(16) (defining a statement in an ancient document as

25  "[a] statement in a document that was prepared before January 1, 1998, and whose authenticity is

26  established.").  Furthermore, the Court does not find that they lack foundation.  *See* 30B Charles

27  Alan Wright & Jeffrey Bellin, Federal Practice & Procedure § 6935 (2018 ed.) ("[E]xclusion of

28  statements in qualifying ancient documents on the grounds that the author lacked firsthand

United States District Court
Northern District of California

knowledge, or (relatedly) that the document contains hearsay-within-hearsay should be rare."). Accordingly, the Court takes judicial notice of these newspaper articles and court filings but does not take judicial notice of the facts within them.  For example, the Court takes judicial notice of the claims asserted in *Petra* and *Kessler*.  The Court does not, however, take judicial notice of any facts in these documents.

Defendants request that the Court take judicial notice of a website hosted by Stanford University containing Southern Pacific's historical documents.  Opp. at 4.  The Court may take judicial notice of websites for their existence and content, but not for the truth of any facts in the documents.  *See Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*, 445 F.Supp.3d 139, 146 (N.D. Cal. 2020).  Accordingly, the Court takes judicial notice of the website's existence and its contents, but it does not take judicial notice of the facts within them.

At the hearing, Defendants raised objections to certain paragraphs of Noah Perch-Ahern's Supplemental Declaration, ECF No. 93-1, as based on hearsay (paragraph 3) and lacking personal knowledge and lacking relevance (paragraphs 7 to 13 and 16).  ECF No. 97 at 53:12–16. Defendants also objected to paragraph 11 of Robert Bylsma's declaration as lacking personal knowledge.  *Id.* at 53:17–18.  The Court sustains Defendants' objection with respect to paragraph 3 of Perch-Ahern's supplemental declaration because the statement, in which Perch-Ahern reports what Union Pacific told him about which files were donated to Stanford University, is hearsay and no exception to the rule applies.  The Court overrules the remainder of Defendants' objections. Paragraphs 7 to 13 and 16 of Perch-Ahern's supplemental declaration identify documents that Union Pacific attached to its reply, summarize the nature of the discovery requests and the claims in this case, or describe the progress of litigation in this case.  All of these topics are relevant to the present disqualification motion and are topics about which Perch-Ahern has personal knowledge. Similarly, paragraph 11 of Bylsma's declaration describes his personal knowledge regarding Union Pacific's in-house attorneys and whether Allen Matkins provided notice to Union Pacific of any conflict.  These are topics about which Bylsma, as in-house counsel for Union Pacific since 1997, would have personal knowledge.  *See* Fed. R. Evid. 602; Bylsma Decl. ¶ 3.

United States District Court
Northern District of California

**IV.    DISCUSSION**

Union Pacific raises three arguments in its motion: (1) that Cooke and Meeder's previous representations of Southern Pacific are substantially related representations that disqualify them from representing Union Pacific, and that disqualification is imputed to Allen Matkins; (2) that Cooke shared confidential information obtained in *Petra* with Allen Matkins lawyers representing Mobile Mini; and (3) that any disqualification of Allen Matkins also extends to SVLG.  Mot. at 8–14.  In the alternative, Union Pacific argues that the Court may impose issue sanctions.  *Id.* at 15. Defendants respond that *Petra* and *Kessler* are not substantially related, no confidential information was shared between Cooke or Meeder and other lawyers at Allen Matkins, and Union Pacific has waived its disqualification argument.  Opp. at 10–14.

**A.    Whether Union Pacific Waived Disqualification**

Before proceeding to the merits, the Court first considers whether Union Pacific has waived disqualification.  Defendants argue that Allen Matkins should not be disqualified because Union Pacific waived the issue by failing to raise it earlier in this litigation or in prior actions in which Allen Matkins was adverse to Union Pacific.  Opp. at 13–14 (referring to *Maionchi v. Safety-Kleen Servs., Inc.*, No. C-03-00647-JF (N.D. Cal. 2003)).  Union Pacific responds that its in-house counsel involved in *Maionchi* were unaware of the conflict.  Mot. at 13–14.

The Court agrees with Union Pacific.  "It is well settled that a former client who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest but who knowingly refrains from asserting it promptly is deemed to have waived that right." *Diva Limousine, Ltd. v. Uber Techs., Inc.*, No. 18-CV-05546-EMC, 2019 WL 144589, at *14 (N.D. Cal. Jan. 9, 2019) (quoting *Tr. Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir. 1983)).  Under California law, "the delay has to be extreme or unreasonable before it operates as a waiver."  *Liberty Nat'l Enterprises, L.P. v. Chicago Title Ins. Co.*, 194 Cal.App.4th 839, 845 (2011); *accord River W., Inc. v. Nickel*, 188 Cal.App.3d 1297, 1311 (1987).  The record shows that by 2003, no in-house attorneys working for Union Pacific would have been familiar with the *Kessler* and *Petra* representations such that they could have raised the conflict.  Bylsma Decl. ¶ 11.  The earliest that Union Pacific might have been put on notice about the conflict is when

10

Ransom and Javandel spoke over the phone on March 3, 2023.  Ransom Decl. ¶ 17; ECF No. 90-1 ("Javandel Decl.") ¶ 22.  But there is no evidence that Ransom communicated the potential conflict to Union Pacific until after his deposition on August 4, 2023.  Ransom Decl. ¶ 20; Perch-Ahern Decl. ¶ 5.  After learning of the conflict on August 4, Union Pacific raised the issue for the first time to the Court on August 22, 2023, in its *ex parte* application to stay depositions.  ECF No. 70.  The present motion to disqualify was filed on September 9, 2023.  ECF No. 86.  The Court does not find a delay of less than a month is extreme or unreasonable.  *Cf. Liberty Nat'l*, 194 Cal.App.4th at 848 (finding a delay unreasonable where the movant waited two years after being put on notice of the conflict to file the motion to disqualify); *River W.*, 188 Cal.App.3d at 1312 (finding a delay of over three years unreasonable).  The Court concludes that Union Pacific did not waive disqualification.

### B.    Disqualification of Allen Matkins

The law imposes two requirements that must be met in order for the Court to disqualify counsel.  First, counsel must have violated the Rules of Professional Conduct.  To find that Allen Matkins has violated the Rules of Professional Conduct in the circumstances of this case, the Court must first determine whether *Petra* or *Kessler* is substantially related to the current representation such that Cooke or Meeder would be disqualified under Rule 1.9.  The Court must then determine whether that conflict may be imputed to Allen Matkins under Rule 1.10.  Second, the Court must conclude that it is appropriate to order disqualification.  In doing so, the Court evaluates whether the equities weigh against disqualification.  *See Klein v. Facebook, Inc.*, No. 20-CV-08570-LHK, 2021 WL 3053150, at *4, *8 (N.D. Cal. July 20, 2021) (noting that disqualification requires a violation of the Rules of Professional Conduct and that the Court find disqualification is appropriate in light of equitable considerations); *Diva Limousine*, 2019 WL 144589, at *3 (same); *see also Kirk v. First Am. Title Ins. Co.*, 183 Cal.App.4th 776, 816 (2010), as modified (May 6, 2010) (similar).

### i.    Whether *Petra* or *Kessler* Is Substantially Related to the Current Representation

Union Pacific's allegations involve conflicts in "successive representations," rather than

"concurrent representations."  Under California Rule of Professional Conduct 1.9(a), "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed written consent." California courts addressing disqualification in successive representations apply a "substantial relationship" test.  Under this test, "[w]here the requisite substantial relationship between the subjects of the prior and the current representations can be demonstrated, access to confidential information by the attorney in the course of the first representation . . . is *presumed* and disqualification of the attorney's representation of the second client is mandatory."  *Jessen v. Hartford Cas. Ins. Co.*, 111 Cal.App.4th 698, 706 (2003) (quoting *Flatt v. Superior Ct.*, 9 Cal.4th 275, 283 (1994)).  When a substantial relationship is shown, "it is well settled actual possession of confidential information need not be proved in order to disqualify the former attorney."  *H. F. Ahmanson*, 229 Cal.App.3d at 1452.

"[W]hether an attorney should be disqualified in a successive representation case turns on two variables:  (1) the relationship between the legal problem involved in the former representation and the legal problem involved in the current representation, and (2) the relationship between the attorney and the former client with respect to the legal problem involved in the former representation."  *Jessen*, 111 Cal.App.4th at 709.  "[W]hen ruling upon a disqualification motion in a successive representation case, the trial court must first identify where the attorney's former representation placed the attorney with respect to the prior client."  *Id.* at 710.  If the prior relationship is sufficiently direct, such as when a lawyer is personally involved in providing legal services to the former client, "then it must be presumed that confidential information has passed to the attorney" and the Court will not look to whether confidential information was actually exchanged during the course of the former relationship.  *Id.* at 709.

The Court then looks to "the strength of the similarities" between the legal problems in the current and former representations.  *Id.*  Analysis of these similarities requires the Court to look to the "subject matter," rather than simply strict facts and issues involved in a particular action.  *Id.* at 711.  Put differently, the subject of a representation includes "information material to the

1    evaluation, prosecution, settlement or accomplishment of the litigation or transaction given its

2    specific legal and factual issues." *Id.* at 713; *see also Victaulic Co. v. Am. Home Assurance Co.*,

3    80 Cal.App.5th 485, 512 (2022) ("[T]o support disqualification the information acquired during

4    the first representation must be material to the second; that is, directly at issue in, or have some

5    critical importance to, the second representation." (cleaned up) (quoting *Wu v. O'gara Coach Co.,*

6    *LLC*, 38 Cal.App.5th 1069, 1083 (2019))).

7                      a.   *Petra* is not substantially related

8            Union Pacific argues that *Petra* is similar to this case because both cases involve

9    environmental contamination at a former Southern Pacific property adjacent to a rail line or rail

10   yard, USTs containing hazardous substances and Southern Pacific's underground storage program,

11   and Mark Ransom as a key witness.  Mot. at 9–10.  Union Pacific also argues that Cooke's deep

12   involvement at the *Petra* trial is a sufficiently direct relationship to establish the second prong of

13   the substantial relationship test.  *Id.* at 10.  In supplemental briefing, Union Pacific also suggested

14   that Block had a direct relationship with Southern Pacific.  ECF No. 107 at 2.  Defendants respond

15   that *Petra* involved Bunker C oil, rather than the chlorinated solvents at issue in this case; *Petra*

16   involved property in San Luis Obispo, rather than the Chestnut Street Property; *Petra* was a state

17   court case involving fraud, rather than a federal action under the RCRA and CERCLA; and *Petra*

18   resolved over twenty-five years ago.  Opp. at 11–12.  Defendants also argue that the facts that

19   Union Pacific alleges were obtained in *Petra* are not confidential.  *Id.* at 12–13.

20           As an initial matter, the Court finds the second prong of the substantial relationship test has

21   been met with respect to Cooke because Cooke served as trial counsel for Southern Pacific in

22   *Petra*, communicated with in-house counsel for Southern Pacific, and prepared Ransom for

23   depositions and trial.  Cooke Decl. ¶ 7; Ransom Decl. ¶ 11; ECF No. 86-3.  It is clear from these

24   facts that Cooke was directly involved in providing legal services to Southern Pacific.  Thus, the

25   Court must presume that Cooke obtained confidential information about Southern Pacific during

26   the *Petra* representation.  *Jessen*, 111 Cal.App.4th at 709; *see also Diva Limousine*, 2019 WL

27   144589, at *11 (finding that a prior representation met the second prong of the substantial

28   relationship test where the attorney was heavily involved in the prior litigation, including

1    contributing to trial briefing).  However, the Court does not find that the second prong has been

2    met with respect to Block.  There is no evidence that Block had a direct relationship with Southern

3    Pacific.  Although Block is listed as counsel on a post-trial motion in *Petra*, ECF No. 93-5 at 2,

4    this evidence is insufficient to show that Block was so personally involved in providing legal

5    services to Southern Pacific such that the Court may presume that Block would have obtained

6    confidential information during the course of his involvement.

7              However, the Court finds that Union Pacific has failed to meet its burden to show that

8    *Petra* is substantially related to this case.  Although the fact that *Petra* was brought in state court

9    and concerned a different property does not preclude the subject matter of that case from being

10   substantially related to this case, the Court finds that the *Petra* representation concerned different

11   subject matter than the current representation.  Defendants' counterclaims in this case concern

12   whether Union Pacific contributed to the contamination of property adjacent to rail lines.  *See* ECF

13   No. 59 at 27–28; ECF No. 60 at ¶ 122.  However, whether Southern Pacific contributed to the

14   contamination of the property does not appear to have been at issue in *Petra*.  Southern Pacific had

15   already contributed to cleaning up the San Luis Obispo property, and the trial concerned whether

16   Southern Pacific had knowledge of the USTs and what representations Southern Pacific made

17   during its sale of the property to the Petra Group.  ECF No. 91 at 6; Cooke Decl. ¶ 7 ("*Petra* was

18   at bottom a business case involving allegations of fraud or non-disclosure in a real estate

19   transaction.  The focus of the dispute was not the environmental investigation or cleanup itself.").

20   The subject matter of *Petra* differs sufficiently from the current representation that the Court

21   cannot conclude by a preponderance of evidence that Cooke would have obtained confidential

22   information that is material to this case.  *See Victaulic*, 80 Cal.App.5th at 512.

23                      b.  *Kessler* is substantially related

24              Union Pacific argues that *Kessler* is similar to this case because both cases involve

25   discovery regarding chlorinated solvents and allegations that Union Pacific or Southern Pacific's

26   operations created contamination that migrated to the property near a rail line or rail yard.  Mot. at

27   10–11.  Union Pacific also argues that Meeder had a direct relationship with Southern Pacific,

28   serving as lead trial counsel, and that Cooke worked on the case in a strategic capacity.  *Id.* at 11.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    In supplemental briefing, Union Pacific also suggested that Block had a direct relationship with

2    Southern Pacific.  ECF No. 107 at 2.  Defendants respond that *Kessler* is distinct because it

3    focused on Bunker C oil, rather than chlorinated solvents; the property was in Brisbane and

4    involved a rail yard, rather than a rail line; *Kessler* was a state court case based on nuisance; and

5    *Kessler* occurred twenty-five years ago.  Opp. at 11–12.  Defendants also argue that Union

6    Pacific's broad characterization of *Kessler* and this case would create a harsh result of

7    disqualifying them from all railroad contamination cases involving Union Pacific.  *Id.* at 12.

8    Finally, Defendants argue that the facts that Union Pacific alleges were obtained in *Kessler* are not

9    confidential.  *Id.* at 13.

10          The Court first finds that the second prong of the substantial relationship test has been met

11   with respect to Meeder, but not Cooke or Block.  Meeder served as lead counsel for Southern

12   Pacific, and his work included communicating with Southern Pacific's in-house counsel and

13   preparing Ransom for his depositions.  ECF No. 86-7 at 2 (listing Meeder as lead counsel); ECF

14   No. 86-8 at 3 (same); ECF No. 86-9 at 3 (same); Meeder Decl. ¶ 14 (noting that Meeder

15   communicated with Southern Pacific's in-house counsel); Ransom Decl. ¶ 14 (noting that Ransom

16   participated with Meeder and Southern Pacific's in-house counsel in confidential discussions and

17   that Meeder prepared Ransom for his deposition).  Thus, Meeder was directly involved in

18   providing legal services to Southern Pacific, and the Court must presume that Meeder obtained

19   confidential information about Southern Pacific during the *Kessler* representation.  *Jessen*, 111

20   Cal.App.4th at 709; *Diva Limousine*, 2019 WL 144589, at *11.

21          However, the evidence before the Court shows that Cooke and Block's roles were much

22   less direct.  The only evidence that Union Pacific identifies for its assertion that Cooke worked in

23   a strategic capacity is a billing record showing that Cooke billed one hour to *Kessler* for a

24   "[c]onference with J. Meeder re trial strategy."  ECF No. 86-16 at 3.  Similarly, although Union

25   Pacific points to evidence that Block is listed as counsel for Southern Pacific on motions in limine,

26   Union Pacific's only other evidence is billing records showing that Block billed less than an hour

27   to *Kessler* for "[l]egal research re jury instructions and procedures for motions in limine."  ECF

28   No. 93-4 at 3; ECF No. 107-7 at 2.  There is no evidence that Cooke or Block had a direct

relationship with Southern Pacific in *Kessler*, and the evidence in the record is insufficient to show that Cooke or Block was so personally involved in providing legal services to Southern Pacific such that the Court may presume that Cooke or Block obtained confidential information.  *Cf. Jessen*, 111 Cal.App.4th at 709.  Because Cooke and Block had more limited roles that took place near the end of the *Kessler* representation (when chlorinated solvents were no longer at issue, *see* Meeder Decl. ¶ 12) the Court concludes that Union Pacific has failed to present sufficient evidence to show that Cooke or Block was "in a position vis-à-vis the client to likely have acquired confidential information material to the current representation."  *Id.* at 710.

The Court next finds that the first prong of the substantial relationship test has been met because the subject matter of *Kessler* is substantially related to the subject matter of the current representation.  *Kessler* involved allegations that Southern Pacific's operations contaminated property adjacent to the rail yard with hazardous materials including chlorinated solvents and Bunker C oil.  ECF No. 86-6 at 6–14.  Similarly, Defendants' counterclaims in this case involve allegations that Union Pacific's operations contaminated property adjacent to a rail line with chlorinated solvents.  ECF No. 59 at 27–28; ECF No. 60 at ¶ 122.  The chlorinated solvents in both cases included TCE, PCE, and TCA.  *Compare* Compl. ¶ 34, *with* ECF No. 86-6 at 9.  The contamination allegedly occurred around the same time.  *Compare* Compl. ¶ 19 (alleging that Defendants' operations, which occurred between the 1960s and 1990s, caused the contamination), *with* ECF No. 86-6 at 7 (noting that Southern Pacific's operations, which allegedly caused the contamination, took place between 1914 and 1983).  These facts indicate that Southern Pacific's policies and practices around the use and storage of chlorinated solvents would have been sufficiently important to Meeder's representation of Southern Pacific in *Kessler* such that confidential information material to the representation would have normally been shared with Meeder.  *See Diva Limousine*, 2019 WL 144589, at *10 (finding that, although there was little overlap in the legal issues raised between the prior and current representation, the representations shared a similar factual predicate such that confidential information about the factual predicate would normally have been shared with counsel in the prior representation); *see also Texaco, Inc. v. Garcia*, 891 S.W.2d 255, 256–57 (Tex. 1995) (finding an attorney disqualified based on a rule

16

1    similar to the California rule where the prior and current representations involved allegations that

2    defendants polluted an adjacent property because the cases "involve[d] similar liability issues,

3    similar scientific issues, and similar defenses and strategies").

4              Moreover, the overlap of factual and legal issues indicates that information about Southern

5    Pacific's policies and practices around chlorinated solvents and Southern Pacific's operations are

6    material to the evaluation, prosecution, settlement or accomplishment of this case.  Indeed,

7    Defendants' discovery requests demonstrate their materiality.  *See MD Helicopters, Inc. v.*

8    *Aerometals, Inc.*, No. 2:16-CV-02249-TLN-AC, 2021 WL 1212718, at *8–9 (E.D. Cal. Mar. 31,

9    2021) (finding that discovery requests seeking documents from the prior representation were

10   evidence that the prior and current representation were related).  For example, Defendants sought

11   discovery about Union Pacific's use of chlorinated solvents, its programs and policies around

12   chlorinated solvents, and information about other legal actions involving allegations of

13   contamination involving Union Pacific and chlorinated solvents.  ECF No. 86-13 at 4.  At

14   Ransom's deposition, counsel for Defendants asked him questions about environmental

15   contamination at other properties, including the Bayshore rail yard.  Ransom Depo. at 10:19–

16   11:10; 22:19–24:9.

17             Defendants' attempts to distinguish *Kessler* from this case take a narrow view of the

18   representations that is contrary to the weight of authority in cases addressing disqualification

19   based on successive representation.  *See, e.g.*, *Diva Limousine*, 2019 WL 144589, at *10 ("Courts

20   have cautioned against 'positing overly restrictive limitations on what is reasonable to assume is

21   communicated between lawyers and their clients,' because 'clients could not be expected to limit

22   themselves to giving their attorneys only the information most relevant or critical to a particular

23   engagement.'" (alteration omitted) (quoting *Openwave Sys., Inc. v. 724 Sols. (US) Inc.*, No. C 09-

24   3511 RS, 2010 WL 1687825, at *5 (N.D. Cal. Apr. 22, 2010))); *see also Jessen*, 111 Cal.App.4th

25   at 712 ("[T]he attorney may acquire confidential information about the client or the client's affairs

26   which may not be directly related to the transaction or lawsuit at hand but which the attorney

27   comes to know in providing the representation to the former client with respect to the previous

28   lawsuit or transaction.").  Defendants note that *Kessler* is a state court action that primarily raised

United States District Court
Northern District of California

1    nuisance claims while Defendants' counterclaims in this federal court case raise statutory claims.

2    Opp. at 12.  But the difference in claims is not dispositive.  *See Diva Limousine*, 2019 WL

3    144589, at *10 ("[T]he lack of overlap in legal issues is not dispositive.").  Instead, the Court must

4    look to the *subject matter* of the two representations more broadly to determine whether

5    information acquired during the former representation is material to the second.  *See Jessen*, 111

6    Cal.App.4th at 711.  As the Court noted above, the subject matter of *Kessler* is substantially

7    similar.

8         Defendants further argue that *Kessler* primarily concerned contamination by Bunker C oil,

9    Opp. at 11–12, and Meeder's declaration states that after discovery and study by environmental

10   forensic consultants, chlorinated solvents were not found on the plaintiffs' property, Meeder Decl.

11   ¶ 12.  But for purposes of the substantial relationship test, the Court is not to look only at issues

12   that remain after discovery.  Instead, the analysis hinges on issues sufficiently material to the prior

13   representation such that the attorney would normally have received confidential information about

14   it.  *See Jessen*, 111 Cal.App.4th at 711–12 ("[F]or discovery purposes, information is relevant to

15   the 'subject matter' of an action if the information might reasonably assist a party in evaluating the

16   case, preparing for trial, or facilitating settlement.").  In this case, Meeder represented Southern

17   Pacific when chlorinated solvents were at issue.  Contamination by chlorinated solvents was raised

18   in the *Kessler* complaint and the Court can infer from Meeder's declaration that the topic was

19   explored in discovery, if only to dispose of the issue.  *See also* Ransom Decl. ¶ 14 (noting that

20   confidential information about Southern Pacific's use and disposal of TCE was exchanged during

21   the representation).  This means that information about Southern Pacific's policies and practices

22   around chlorinated solvents would normally have been exchanged with Meeder during the course

23   of the representation.

24         Defendants also argue that *Kessler* concerned contamination from a rail yard rather than

25   the rail line, which is at issue in this case.  Opp. at 12; ECF No. 97 at 16:1–17:15 (counsel from

26   Allen Matkins arguing that Defendants' discovery was intended to determine whether Union

27   Pacific transported chlorinated solvents for chip makers).  But this assertion is belied by the scope

28   of Defendants' discovery, which sought information about "other legal actions involving Union

United States District Court
Northern District of California

Pacific's chlorinated solvent contamination" and "Union Pacific's maintenance programs and policies involving chlorinated solvents." ECF No. 86-13 at 4. Moreover, the record suggests that Meeder received information about Southern Pacific's policies and practices more broadly, and nothing suggests that it was limited to policies and practices around rail yards. *See, e.g.*, Ransom Decl. ¶ 14; *see also Diva Limousine*, 2019 WL 144589, at *10 (noting that clients regularly provide attorneys with more information than necessary to carry out a representation); *Jessen*, 111 Cal.App.4th at 712 (similar).

Defendants argue that *Kessler* concluded over twenty-five years before this case and that Meeder does not remember what, if any, confidential information he might have received. Opp. at 12. Neither fact is sufficient to overcome the conclusive presumption that Meeder obtained confidential information in the former representation. *See Brand v. 20th Century Ins. Co./21st Century Ins. Co.*, 124 Cal.App.4th 594, 607 (2004) ("Neither [the attorney's] professed failure to recall any confidential information obtained during his representation of [the former client] nor the passage of 12 years since he directly represented [the former client] can overcome the conclusive presumption in this case."); *MD Helicopters*, 2021 WL 1212718, at *7 (finding that it would be improper to allow "declarations by self-interested parties" that they received no confidential or privileged information to defeat the presumption that confidential information was exchanged). To the extent that Defendants argue that the passage of time alone is relevant, it is only relevant to the extent that it might "affect the inferences the Court may make about the legal similarities between the cases and the materiality of any similarities that might exist." *Hartford Cas. Ins. Co. v. Am. Dairy & Food Consulting Lab'ys, Inc.*, No. 1:09-CV-0914 OWW SKO, 2010 WL 2510999, at *5 (E.D. Cal. June 17, 2010) (finding the passage of time relevant because defendants' policies were "subject to substantial modification over time"). The fact that *Kessler* concluded twenty-five years before this case does not affect the similarities between the two representations because the contamination in this case allegedly occurred within a similar time frame as the contamination in *Kessler*, so the information about Southern Pacific's policies and practices at that time would also be relevant in this case. *See* Compl. ¶ 19; ECF No. 86-6 at 7.

Finally, whether the information on which Defendants relied in pursuing discovery and to

support their counterclaims is confidential is not relevant to the substantial relationship test.  When the Court finds that the relationship between the attorney and the former client is sufficiently direct, it need not analyze "whether the attorney possesses actual confidential information."  *City & Cnty. of San Francisco v. Cobra Sols., Inc.*, 38 Cal.4th 839, 847 (2006); *see also Jessen*, 111 Cal.App.4th at 710–11 ("If the court determines that the placement was direct and personal . . . [the Court's examination of the similarities between the issues of the representations] may not include an 'inquiry into the actual state of the lawyer's knowledge.'" (quoting *Ahmanson*, 229 Cal.App.3d at 1453)).

Because the Court concludes that *Kessler* is substantially related to the current representation, Meeder would be disqualified from representing Union Pacific in this action.  *See Cobra*, 38 Cal.4th at 847 ("When a substantial relationship between the two representations is established, the attorney is automatically disqualified from representing the second client.").  The Court must next examine whether this disqualification extends to Allen Matkins.[1]

### ii.      Whether Allen Matkins Must Be Vicariously Disqualified

The question of vicarious disqualification requires the Court to make two determinations.  First, it must determine whether Meeder's conflict is automatically imputed to all lawyers at Allen Matkins or if the Court may look to the circumstances of this case.  Second, if the Court may look to the circumstances of this case, it must determine what standard of vicarious disqualification to apply—a question that turns on the relationship between Meeder and Allen Matkins.

#### a.   Whether vicarious disqualification is automatic

The parties disagree about whether Meeder's conflict is automatically imputed to all lawyers at Allen Matkins or if the Court may look to the circumstances of this case.  Union Pacific argues that vicarious disqualification of a tainted attorney's law firm is mandatory under California Supreme Court precedent.  ECF No. 100 at 1.  Defendants argue that Union Pacific cites to dicta and that vicarious disqualification requires a case-by-case analysis.  ECF No. 99 at

---

[1] Because the Court finds that *Petra* is not substantially related and that Cooke did not have a direct relationship with Southern Pacific in *Kessler*, it need not address Union Pacific's argument in the alternative that Cooke actually shared confidential information with other attorneys at Allen Matkins.  Mot. at 12–13.

United States District Court
Northern District of California

2–3.

The Court agrees with Defendants that although vicarious disqualification of a tainted attorney's firm is the general rule, the presumption that knowledge is imputed to all members of a tainted attorney's firm is a rebuttable one.  *See Kirk*, 183 Cal.App.4th at 801.  Union Pacific's argument that vicarious disqualification is mandatory relies primarily on a statement by the California Supreme Court in *Flatt v. Superior Court* that, once an attorney is disqualified, "the disqualification extends vicariously to the entire firm."  *Flatt*, 9 Cal.4th at 283.  This statement has been quoted in subsequent California Supreme Court cases, including *SpeeDee Oil* and *Cobra*.  *See SpeeDee Oil*, 20 Cal.4th at 1153; *Cobra*, 38 Cal.4th at 847–48.  However, more recently, the California Court of Appeal, in a comprehensive analysis of relevant case law, concluded that *Flatt*'s statement that automatic disqualification extends vicariously to the entire firm is dicta.  *Kirk*, 183 Cal.App.4th at 796.  The Court agrees with the analysis in *Kirk*.  The California Supreme Court in *Flatt* had no occasion to consider whether a tainted attorney's law firm was subject to vicarious disqualification.  *See Kirk*, 183 Cal.App.4th at 796–97.  Moreover, *Flatt* supports its assertion with a citation to *Henriksen v. Great American Savings & Loan*, which did not find vicarious disqualification mandatory in every circumstance, but instead found vicarious disqualification mandatory where the tainted attorney changed sides in the same case.  *See Henriksen v. Great American Savings & Loan*, 11 Cal.App.4th 109, 115, 117 (1992).  Thus, *Flatt*'s statement that automatic disqualification extends to the entire firm is dicta, and it is persuasive but not binding authority.  *See People v. Gaines*, 93 Cal.App.5th 91, 111 (2023).  Moreover, the California Supreme Court has left open the possibility that the presumption of shared confidences among attorneys at a law firm can be rebutted.  *See SpeeDee Oil*, 20 Cal.4th at 1151 ("[W]e need not consider whether an attorney can rebut a presumption of shared confidences, and avoid disqualification, by establishing that the firm imposed effective screening procedures.").

As such, although vicarious disqualification of a tainted attorney's law firm is the general rule, the presumption that knowledge is imputed to all members of the law firm may be rebutted under certain circumstances.  Once the moving party has established that a substantial relationship

1   exists between the former and current representations such that the attorney involved in the former

2   representation is conclusively presumed to have received confidential information, the burden

3   shifts to the challenged firm to establish an exception to vicarious disqualification.  *See Kirk*, 183

4   Cal.App.4th at 810.

5              b.   Which standard for vicarious disqualification applies

6          California Rule of Professional Conduct 1.10 governs the imputation of a tainted attorney's

7   conflict to the attorney's firm.  Rule 1.10 presents two different sets of rules, the application of

8   which depends on whether the tainted attorney is currently associated with the firm or whether the

9   tainted attorney has terminated association with the firm.  *Compare* Cal. R. Prof'l Conduct 1.10(a)

10  (governing imputation of a currently associated attorney's conflict to the firm), *with* Cal. R. Prof'l

11  Conduct 1.10(b) (governing imputation of a terminated attorney's conflict to the firm).  California

12  decisional law is in accord.  California Courts of Appeal have held that, when a tainted attorney

13  continues to be associated with a firm, the presumption of shared knowledge applies, but it can be

14  rebutted by a showing that the firm implemented an effective ethical wall.  *See Kirk*, 183

15  Cal.App.4th at 801 (holding that the presumption of imputed knowledge "can be refuted by

16  evidence that ethical screening will effectively prevent the sharing of confidences in a particular

17  case"); *see also Nat'l Grange of Ord. of Patrons of Husbandry v. California Guild*, 38

18  Cal.App.5th 706, 715 (2019) (same).  If, however, the tainted attorney left the firm, then the

19  presumption of shared knowledge is rebutted by a showing that confidential information was not

20  actually exchanged.  *See Kirk*, 183 Cal.App.4th at 815 (noting that when the disqualified attorney

21  leaves the firm, the analysis changes from whether there is a *risk* that confidential information will

22  be shared with other attorneys at the firm to whether the disqualified attorney *actually* conveyed

23  confidential information).

24         Thus, which standard the Court applies depends on whether Meeder is currently associated

25  with Allen Matkins or whether he has terminated association with the firm.  Defendants argue that,

26  because Meeder's contract with Allen Matkins formally ended on June 30, 2023, the Court must

27  apply the vicarious disqualification standard for a former tainted attorney.  ECF No. 106 at 3–4;

28  *see also Kirk*, 183 Cal.App.4th at 815–16 (holding that, when a tainted attorney left a firm during

1   the pendency of the appeal, the trial court should consider whether confidential information was

2   actually exchanged).  Union Pacific argues that the Court should apply the standard for a lawyer

3   currently associated with the firm because Allen Matkins has continued to hold Meeder out as

4   associated with the firm after June 30, 2023.  ECF No. 107 at 1–2.

5          The Court observes that Defendants have presented conflicting evidence regarding

6   Meeder's association with Allen Matkins after June 30, 2020.  Meeder retired from Allen Matkins

7   on June 30, 2020, but his association with the firm did not end completely.  Meeder's declaration

8   states that, on July 1, 2020, he "transitioned to an hourly part-time contract attorney in an of

9   counsel position."  Meeder Decl. ¶ 4.  Meeder explained that his contract "limits the scope of [his]

10  work at Allen Matkins . . . to a single complex matter known as the *Emhart/Black & Decker*

11  Litigation."  *Id.*  After the Court asked for further supplemental briefing to clarify Meeder's role,

12  Defendants submitted the declaration of an Allen Matkins' associate general counsel, clarifying

13  that Meeder's role after July 1, 2020 is most accurately described as that of an hourly contract

14  attorney.  Marino Decl. ¶ 9.  After June 30, 2020, Meeder was removed from Allen Matkins's

15  website.  *Id.* ¶ 7.  Moreover, Meeder's contract limited his work to the *Emhart* matter, Meeder

16  would no longer interface with the client on the *Emhart* matter, and that Meeder's name would no

17  longer appear on pleadings as an attorney of record with Allen Matkins.  *Id.* ¶¶ 6, 9; ECF No. 106-

18  1 at 10–11.  Although Meeder's contract was extended periodically, the agreement expired on

19  June 30, 2023 and has not been renewed.  Marino Decl. ¶¶ 8–9.  Despite the end of Meeder's

20  association with the firm on June 30, 2023, Defendants' recent filings in opposition of Union

21  Pacific's motion have implicitly represented to the Court that Meeder is still associated with Allen

22  Matkins.  For example, Meeder's declaration, dated on September 12, 2023, does not discuss how

23  his contract was not renewed on June 30, 2023 and uses the present tense to describe his contract.

24  *See* Meeder Decl. ¶ 4 (noting that Meeder's contract "*limits* the scope of" his work (emphasis

25  added)).  Similarly, Javandel's declaration, which was signed on September 13, 2023, states that

26  Allen Matkins established an ethical wall around Meeder on August 18, 2023.  Javandel Decl.

27  ¶ 10.  Other evidence suggests that Meeder continues to be associated with Allen Matkins.  For

28  example, Meeder's California State Bar profile lists his address as Allen Matkins's office and his

United States District Court
Northern District of California

23

email uses an Allen Matkins domain name, ECF No. 107-3 at 2; the docket for the *Emhart* litigation continues to list Meeder as an attorney for the plaintiff and cross-defendant, ECF No. 107-2 at 3; and Meeder's LinkedIn profile states that he is a partner at Allen Matkins, ECF No. 107-4 at 2.

Assuming that Meeder continues to be associated with Allen Matkins, it is unclear whether the nature of his current association with Allen Matkins justifies vicarious disqualification. *SpeeDee Oil* offers some guidance.  In *SpeeDee Oil*, the California Supreme Court addressed whether the conflicts of an attorney designated as "of counsel" could be imputed to a law firm.  20 Cal.4th at 1152–56.  The California Supreme Court held that the conflicts of an of counsel attorney were imputed to his law firm because of counsel attorneys have a "close, personal, continuous, and regular relationship" with their law firms and law firms hold of counsel attorneys out to the public as available to clients of the firm.  *Id.* at 1153–54.  In contrast, Meeder's current association with Allen Matkins is more limited.  The terms of his contract limit his work for the firm to the *Emhart* matter.  Marino Decl. ¶ 6; ECF No. 106-1 at 10–11.  Moreover, since Meeder's retirement in June 2020, he has had far fewer opportunities to communicate with Allen Matkins attorneys than a typical of counsel attorney.  Meeder retired during the beginning of the COVID-19 pandemic, in which the Allen Matkins San Francisco office was shut down.  *See* ECF No. 106-1 at 7.  Moreover, Meeder moved to Bend, Oregon in March 2022.  Meeder Decl. ¶ 5.  Thus, the decision in *SpeeDee Oil* does not appear to apply to this case.  *Cf. SpeeDee Oil*, 20 Cal.4th at 1154 ("An of counsel attorney, particularly one frequently in the firm's offices or in contact with the firm's attorneys, may be consulted on a variety of matters without being formally identified as cocounsel.").  Finally, Allen Matkins took steps, albeit incomplete steps, to avoid holding Meeder out as associated with the firm after his June 30, 2020 retirement.  Meeder's contract stated that he would no longer interface with the client or appear as attorney of record on any pleadings in the *Emhart* litigation.  Marino Decl. ¶ 6; ECF No. 106-1 at 10–11.  Although Meeder did not modify his own listing with the California State Bar to remove his association with Allen Matkins, ECF No. 107-3 at 2, Allen Matkins removed Meeder from the firm website after June 30, 2020.  Marino Decl. ¶ 7.  Thus, unlike in *SpeeDee Oil*, Allen Matkins has not continued to hold Meeder

1   out as associated with the firm.  *Cf.  SpeeDee Oil*, 20 Cal.4th at 1153.

2         Based on this evidence, the Court cannot conclude that Meeder's relationship with Allen

3   Matkins since his June 2020 retirement is so "close, personal, continuous, and regular" such that

4   the Court should analyze vicarious disqualification through the lens of a lawyer currently

5   associated with the firm.  However, because Meeder's prior relationship with Allen Matkins was

6   that of a partner, the Court will analyze vicarious disqualification through the lens of a departed

7   attorney.

8                           c.   Applying the relevant standard

9         Under the California Rules of Professional Conduct and California decisional law, the

10  Court must determine whether confidential information was actually exchanged between Meeder

11  and other attorneys at Allen Matkins.  Rule 1.10(b) states:

12              When a lawyer has terminated an association with a firm, the firm is
                not prohibited from thereafter representing a person with interests
13              materially adverse to those of a client represented by the formerly
                associated lawyer and not currently represented by the firm, unless:
14                   (1) the matter is the same or substantially related to that in which
                     the formerly associated lawyer represented the client; and
15                   (2) any lawyer remaining in the firm has information protected by
                     Business and Professions Code section 6068, subdivision (e)
16                   and rules 1.6 and 1.9(c) that is material to the matter."

17  Cal. R. Prof'l Conduct 1.10(b).  The California Courts of Appeal have clarified that the inquiry is

18  a retrospective one that considers "whether the tainted attorney *actually* conveyed confidential

19  information."  *Kirk*, 183 Cal.App.4th at 815–16 (citing *Goldberg v. Warner/Chappell Music, Inc.*,

20  125 Cal. App. 4th 752, 762 (2005)); *see also Fluidmaster, Inc. v. Fireman's Fund Ins. Co.*, 25

21  Cal.App.5th 545, 552 (2018) ("[O]nce a disqualified attorney leaves the target firm, the only real

22  question is whether any confidences were shared with the target firm."); *California Self-Insurers'*

23  *Sec. Fund v. Superior Ct.*, 19 Cal.App.5th 1065, 1078–79 (2018) (instructing the trial court to

24  determine "whether confidential information was, indeed, transmitted from [the tainted former

25  attorney] to the attorneys working on the matter at [the firm]"); *Goldberg v. Warner/Chappell*

26  *Music, Inc.*, 125 Cal.App.4th 752, 762 (2005) (analyzing whether confidential information was

27  actually divulged in a case where the attorney had departed the law firm three years prior to the

28  challenged reputation).

United States District Court
Northern District of California

25

1    Allen Matkins argues that Meeder did not convey confidential information from Southern

2    Pacific to anyone at the firm.  ECF No. 106 at 3–4.  Union Pacific responds that the departed

3    attorney analysis from *Kirk* does not apply because Cooke and Block each worked on *Kessler* and

4    remain at Allen Matkins and, separately, Cooke and Block independently satisfy the substantial

5    relationship test.  ECF No. 107 at 2–3.  Union Pacific also argues that self-serving declarations by

6    Allen Matkins attorneys are insufficient evidence and that it is likely that Meeder shared

7    confidential information with his colleagues because Meeder worked in the same office and

8    practice group as most of the other lawyers on this matter and worked closely with Javandel.  *Id.* at

9    3.

10    Although a close question, the Court finds that Defendants have presented sufficient

11   evidence to rebut the presumption that confidential information was transmitted.  *See Kirk*, 183

12   Cal.App.4th at 816 (requiring the challenged law firm to "overcome the rebuttable presumption

13   that confidential information was transmitted, by offering sufficient evidence that confidential

14   information was not, in fact, transmitted").  Defendants point to the declarations of Cooke,

15   Javandel, and Meeder, which assure the Court that no confidential information was actually

16   exchanged.  *See* Javandel Decl. ¶ 2 ("James Meeder has [n]ever shared any privileged or

17   confidential information obtained from Union Pacific or Southern Pacific with me or any of the

18   other attorneys working on this case, nor is there any risk that would ever occur."); Cooke Decl.

19   ¶ 24 ("I have never provided any confidential information about Southern Pacific or any Southern

20   Pacific matter to anyone at Allen Matkins."); Meeder Decl. ¶ 15 ("I therefore am certain that I

21   never shared, had never been asked to share, or had the occasion to share any confidential

22   information . . . .").  The Court acknowledges that "declarations alone are not enough to establish

23   that no confidential information was actually conveyed."  *State Comp. Ins. Fund v. Drobot*, No.

24   SACV 13-956 AG (CWX), 2014 WL 12579808, at *8 (C.D. Cal. July 11, 2014).

25    However, Defendants have offered more than just declarations.  As discussed above,

26   Meeder retired from the firm almost a year before the complaint in this case was filed.  *Compare*

27   Marino Decl. ¶ 5 (Meeder retired on June 30, 2020), *with* Compl. (filed on April 30, 2021).

28   Indeed, Meeder retired at the beginning of the COVID-19 Pandemic—when the Allen Matkins

26

San Francisco Office was closed—and he moved to Bend, Oregon in March 2022.  No. 106-1 at 7; Meeder Decl. ¶ 5.  Meeder's involvement at the firm was also limited by contract to the *Emhart* matter.  Marino Decl. ¶ 6; ECF No. 106-1 at 10–11.  Given these facts, it is unlikely that Meeder would have had any opportunity to divulge confidential information to other attorneys at Allen Matkins.  *See State Comp. Ins. Fund*, 2014 WL 12579808, at *8 (finding "no genuine likelihood that allowing [the challenged firm] to remain on the case will affect the outcome of the proceedings" where, among other things, "it is less likely that transactional attorneys [like the tainted attorney] are 'sitting around the coffee pot' with litigation attorneys to share confidential information with them").  Defendants also point to evidence that their discovery and deposition questions were not based on confidential information, but on publicly available information.  For example, although Ransom expressed concern that his deposition questions were based on confidential information, Ransom Decl. ¶ 20, Defendants clarify that their questions during Ransom's deposition were based on Ransom's deposition transcript in *Universal Paragon*.  Javandel Decl. ¶¶ 18–19; ECF No. 90-3 ("Barrett Decl.") ¶ 4; *see also* Barrett Decl. ¶ 5 (clarifying that any questions about USTs were raised because a UST is at issue in this case or were based on exhibits that Union Pacific produced).  Similarly, Cooke explains that "[i]nformation regarding a company's handling and storage of hazardous materials is normally non-privileged and non-confidential information that is routinely the subject of public reporting to governmental regulatory agencies, and, in the litigation setting, of discovery, disclosure, expert opinion and testimony."  Cooke Decl. ¶ 23.

Although there is some evidence that might remotely suggest that confidential information was exchanged, the Court finds that this evidence is insufficient and outweighed by Defendants' evidence that no confidential information was exchanged.  First, Allen Matkins did not establish an ethical wall around Meeder until August 18, 2023.  Javandel Decl. ¶ 10.  Under California law, this ethical wall is not timely.  *See Nat'l Grange of Ord. of Patrons of Husbandry*, 38 Cal.App.5th at 715 ("[A] firm must impose screening measures when the conflict first arises.").  However, it is not clear that an ethical wall was necessary to prevent actual disclosure of confidential information given that Meeder had retired before conflict arose.  Similarly, Meeder had few, if any,

United States District Court
Northern District of California

opportunities to share confidential information because Meeder was no longer physically in the Allen Matkins office and his work and compensation were limited to the *Emhart* matter.  Second, Allen Matkins retained 24 boxes of documents from *Kessler*.  Macey Decl. ¶ 4.  However, these boxes were kept in offsite storage, and other than the 2006 production of documents in response to a subpoena from counsel in *Universal Paragon*, there is no evidence that any lawyers at Allen Matkins took any steps to access or review the documents.  Third, Union Pacific argues that Allen Matkins must still be disqualified because attorneys at the firm have retained confidential information—namely, Cooke and Block.  *See* ECF No. 107 at 2.  However, as the Court has already found, Cooke and Block did not have a sufficiently direct relationship with Southern Pacific in *Kessler* such that they are likely to have acquired confidential information during the representation.  *See, e.g.*, ECF No. 86-16 at 3 (showing that Cooke billed one hour to *Kessler* for a "[c]onference with J. Meeder re trial strategy"); ECF No. 93-4 at 3 (showing that Block billed less than one hour to *Kessler* for "[l]egal research re jury instructions and procedures for motions in limine").  This evidence does not demonstrate that confidential information was *actually* exchanged between Meeder and the other attorneys at Allen Matkins.  Moreover, it is outweighed by Defendants' evidence that Meeder had limited opportunities to convey confidential information before he was walled off from the representation, Allen Matkins relied on publicly available evidence to create its discovery requests and deposition questions, and the attorneys at Allen Matkins unequivocally denied sharing confidential information from the *Kessler* representation.

Disqualification "is a drastic remedy that should be ordered only where the violation of the privilege or other misconduct has a 'substantial continuing effect on future judicial proceedings.'" *City of San Diego v. Superior Ct.*, 30 Cal.App.5th 457, 462 (2018), *as modified on denial of reh'g* (Jan. 7, 2019) (quoting *Gregori v. Bank of Am.*, 207 Cal.App.3d 291, 309 (1989), *modified* (Feb. 17, 1989)); *see also Kirk*, 183 Cal.App.4th at 815 ("The purpose of a disqualification order is prophylactic, not punitive.").  Considering the record as a whole, the Court is persuaded that there is no "genuine likelihood" that allowing Allen Matkins remain as counsel for Mobile Mini will affect the outcome of the proceedings or give Defendants an unfair advantage in this case.  Thus, the Court finds that Allen Matkins is not vicariously disqualified.

### iii.   Whether the Equities May Excuse Disqualification

Defendants argue that they would be prejudiced by the disqualification of Allen Matkins because this case has advanced to the filing of dispositive motions, disqualification would delay the case, Allen Matkins and Mobile Mini have dedicated significant time and money to defending this litigation, and Union Pacific has engaged in tactical abuse.  Opp. at 15.  Union Pacific responds that Mobile Mini has an agreement with Robert W. Hill to indemnify Mobile Mini, Allen Matkins did not take significant action in this case until May 2023, and Union Pacific will be prejudiced if conflicted opposing counsel is allowed to remain on the case.  Reply at 7.

As noted above, the equitable considerations that the Court may consider in deciding whether disqualification is appropriate include:  "[A] client's right to chosen counsel, an attorney's interest in representing a client, the financial burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion." *SpeeDee Oil*, 20 Cal.4th at 1145.  The Court does not find that Union Pacific engaged in tactical abuse because, as discussed above, Union Pacific did not delay in seeking disqualification once it became aware of the conflict.  *See W. Sugar Coop. v. Archer-Daniels-Midland Co.*, 98 F.Supp.3d 1074, 1092 (C.D. Cal. 2015) (finding no tactical abuse where the motions were filed days after the movant learned of the conflict and met and conferred with opposing counsel).  However, the Court finds that Defendants would face substantial prejudice if the Court disqualifies Allen Matkins.  Allen Matkins has committed over 2000 billable hours to litigating this case and Mobile Mini has paid Allen Matkins over $1 million in fees.  Javandel Decl. ¶¶ 30, 32.  The parties have finished briefing on Defendants' motion for summary judgment, ECF Nos. 104, 108, 112, 113, and are preparing for a hearing on the motion on November 16, 2023.  Trial is set for April 2024.  If the Court disqualifies Allen Matkins and Mobile Mini is forced to retain new counsel, the hearing on the motion for summary judgment would need to be delayed, and the trial might be delayed as well.  Finally, Mobile Mini is entitled to its choice of counsel.  The Court acknowledges that "[t]he important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." *SpeeDee Oil*, 20 Cal.4th at 1145.  Where, as here, Defendants have presented persuasive evidence to show that confidential information was not

actually exchanged between Meeder and other attorneys at Allen Matkins, the need to maintain ethical standards and maintain public trust in the administration of justice and the integrity of the bar weigh less heavily in the Court's equitable analysis.

As such, the Court finds that disqualification is inappropriate because the substantial prejudice that disqualification poses to Defendants outweighs the other equitable considerations in this case.

### C.     Disqualification of SVLG

Although Union Pacific's motion argued that SVLG should be disqualified because of the joint defense agreement between SVLG and Allen Matkins, counsel for Union Pacific withdrew this argument at the hearing.  *See* Mot. at 14; ECF No. 97 at 48:6–7 ("I'm withdrawing my request that Silicon Valley Law Group be disqualified.").  Accordingly, SVLG is not disqualified.

### D.     Whether the Court Should Impose Issue Sanctions

Union Pacific argues in the alternative that the Court may impose issue sanctions rather than finding Allen Matkins disqualified.  Mot. at 15.  Union Pacific requests a sanction "preclude[ing] Defendants from seeking discovery, introducing, or otherwise using evidence related to the prior representations, *i.e.*, that Union Pacific rail operations contaminated the Property."  *Id.*  Defendants respond that Union Pacific's requested issue sanctions are inappropriate.  Opp. at 15.

"California courts have found that sanctions less severe than disqualification, such as the imposition of attorney's fees, may be appropriate."  *UMG Recordings, Inc. v. MySpace, Inc.*, 526 F.Supp.2d 1046, 1063 (C.D. Cal. 2007); *see also Neal v. Health Net, Inc.*, 100 Cal.App.4th 831, 844 (2002) (listing alternative sanctions); *but see W. Sugar Coop.*, 98 F.Supp.3d at 1093 (finding alternatives to disqualification inappropriate).

The Court finds that issue sanctions are unnecessary.  Union Pacific primarily relies on *UMG Recordings* to support its argument for issue sanctions.  See Mot. at 15; ECF No. 100 at 2–3.  In *UMG Recordings*, the court fashioned an alternative remedy to disqualification, finding that under the circumstances, the imposition of fees and issue sanctions would fully vindicate the need to maintain ethical standards.  *See UMG Recordings*, 526 F.Supp.2d at 1063–65.  However, the

United States District Court
Northern District of California

1    Court has found that there is no genuine likelihood that Southern Pacific's confidential

2    information will be used against Union Pacific in this matter.  In light of this finding, such

3    sweeping sanctions, which would preclude Defendants' counterclaims entirely, are not justified to

4    maintain ethical standards.  Thus, the Court declines to impose issue sanctions on Defendants.

5    **V.     ORDER**

6           For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiff Union Pacific

7    Railroad Company's Motion to Disqualify (ECF No. 86) is DENIED.

8

9    Dated:  November 8, 2023

10                                                      _____

11                                                      BETH LABSON FREEMAN
                                                        United States District Judge